WILLIAM HENRY, HIGH SHERIFF OF THE TERRI- TORY OF HAWAII, AND GEO. C. SEA, DEPUTY HIGH SHERIFF OF THE TERRITORY OF HAWAII, *v.* WALTER C. SHIELDS, THEO. H. DAVIES & COMPANY, A CORPORATION, AH PING AND KIPAHULU SUGAR COMPANY, A CORPORATION.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

ARGUED JANUARY 4, 5, 1909.                    DECIDED JANUARY 11, 1909

HARTWELL, C. J., WILDER, J., AND CIRCUIT JUDGE DE BOLT
IN PLACE OF BALLOU, J.

CONTRACTS—*extrinsic evidence.*

Words in an agreement having an ordinary meaning free from ambiguity and not technical cannot be explained by extrinsic evidence.

CONTRACTS—*construction.*

An agreement whereby a plantation company makes over its plantation to A to cultivate sugar cane and make sugar thereon without charge for the use of it, and declaring that its standing crops are to be the property of A, and that the company will pay

for the sugar delivered f. o. b. vessel at company's wharf, $20 a ton for the season of 1907, $30 per ton for the season of 1908 and $50 per ton for the season of 1909, there being no provision in the agreement for securing delivery of the sugar to the company, makes the sugar stored in a warehouse on the plantation prior to delivery to the company subject to levy of execution on judgments by creditors of A, although under the agreement the company advanced all the funds for running the plantation.

## OPINION OF THE COURT BY HARTWELL, C. J.

Writs of execution in favor of the defendants Theo. H. Davies & Co. and Walter C. Shields upon judgments for $1236.-99 and $1966.75, obtained by them respectively against the defendant Ah Ping, having been issued to the high sheriff, and his deputy having levied upon 900 bags of sugar in the plantation warehouse at Kipahulu, Maui, and removed the sugar to Honolulu, the sugar company gave notice to the officers that the sugar was its sole property and demanded its immediate surrender and delivery to its agent H. Hackfeld & Co. Thereupon the officers applied for interpleader and upon an order to file their claims or relinquishment of them the sugar company filed its claim, the judgment creditors filed their denial of it and Ah Ping his disclaimer. The judge heard the case without a jury and decided in favor of the judgment creditors, the sugar company excepting to his ruling excluding evidence and to the judgment entered upon the decision. By agreement the sugar was sold for $62 a ton and the proceeds held by the high sheriff on deposit with Bishop & Co. to await final determination of the claimants' right thereto or to any part thereof.

The claim filed by the Kipahulu Sugar Co. was that it is and for many years has been owner and lessee of certain lands at Kipahulu, Maui, with buildings, machinery, tools and livestock comprising the Kipahulu sugar plantation and mill and has operated the plantation and mill for cultivation of sugar cane and manufacture of the same into sugar; that in Decem-

ber 1906 a preliminary agreement was entered into with Ah Ping that he should be given the opportunity to engage in the enterprise of raising sugar cane and manufacturing it into sugar upon the company's lands, and that March 12, 1907, the agreement was reduced to writing and signed by the company, Ah Ping and H. Hackfeld & Co.; that since December 15, 1906, Ah Ping has been engaged in that enterprise using the buildings, tools, machinery and livestock before used and operated by the company as its sugar plantation and mill; that the cane from which the sugar levied upon was grown upon those lands; that the company never conveyed or transferred to Ah Ping the cane or sugar and is and was its sole owner, Ah Ping having no interest in it save only in accordance with the terms of the written contract by which he is entitled to be paid $30 for each 2000 pounds of sugar of the crop of 1908 delivered f. o. b. at the company's wharf at Kipahulu; that he is not entitled to the $30 a ton but is to be given credit on account of advances made to him on the contract, the final settlement to be at its termination or when the crop of 1909 shall have been fully manufactured; that the company has guaranteed payment of all advances by H. Hackfeld & Co. for cultivation and manufacture of sugar under the written agreement.

It is contended by the judgment creditors, Shields and Theo. H. Davies & Co., that since by the terms of the written agreement all growing crops upon the lands of the sugar company were to become the property of Ah Ping he became owner of the sugar made therefrom and that if the agreement required by implication its delivery by him to the company for $30 a ton this was merely a contractual obligation not enforceable otherwise than by an action for damages, the company having relied solely upon its confidence in his observance of the possibly implied agreement to deliver the sugar to it.

The sugar company denies that the legal effect of the agreement, taken as a whole, was to give Ah Ping the ownership of

the crops or the sugar and claims that if there were ambiguity or uncertainty in its terms it ought to have been allowed to show the preliminary oral agreement and the understanding of the parties as to the written agreement. The company offered evidence, which was not admitted, that the oral agreement was that Ah Ping should be given an opportunity to cultivate sugar cane on the company's lands and make sugar from it for the sole compensation of a percentage by a tonnage rate and have no interest in the sugar or in the land and that he was not a tenant of the company in any sense.

*Freeman v. Bartlett*, 47 N. J. L.' 33; *Gill Mfg. Co. v. Hurd*. 18 Fed. 673; *Jennings v. Whitehead & Atherton Machine Co.*. 138 Mass. 594, are cited in support of the exception to the refusal to admit this evidence.

The first case was an action on an agreement under which the defendant occupied the plaintiff's hotel, which the plaintiff contended was completely expressed in a certain writing, while the defendant insisted that part of it was verbal and that the writing did not express the whole agreement. The court held that a certain writing, not signed by the parties, which was drawn by the plaintiff and handed to the defendant who interlined and returned it to the plaintiff, was admissible in evidence as "a transaction constituting part of the negotiation out of which the contract emerged. It was part of the res gestae." It appeared, however, that all that the interlined paper contained "was not questioned at the trial" and was stated to the jury by the plaintiff with the paper before him as a memorandum, so that "there was no room for mistake." The court said "upon the point decided, namely, whether this writing contained the entire agreement between the parties, it is obvious that the writing itself could have thrown no additional light. The rule is well settled that when the plaintiff in error has sustained no injury he cannot rely upon a technical mistake on the part of the court as a ground for reversing the judgment." The case is not

authority for the admissibility of evidence of preliminary nego-
tiations.

The second case was an action for damages for non-acceptance
of 100 box cars made for the defendant under contract to pay
for each $580 on delivery. The defendant in his answer denied
making the contract; averred that while there were negotiations
looking towards a possible contract if they could agree upon its
terms they did not ripen into an agreement; that in the nego-
tiations the defendant informed the plaintiff that if a contract
were made he should require a warranty of the cars; that the
warranty was never given, and that shortly after the negotia-
tions and before the plaintiff had done any work the defendant
gave him notice not to build any for him. The plaintiff denied
that the defendant in the negotiations required the warranty.
The court instructed the jury: "In determining what the con-
tract was the rule is to consider the negotiations passing between
the parties. Their conversation in relation to it before com-
pleted, if the same is understood by the parties, shall be incor-
porated in the contract even though such negotiations are not
repeated at the time of its completion, and such previous under-
standing would constitute a part of it unless changed or exe-
cuted at the time it may be so completed." The case shows no
contract other than resulted from the negotiations, hence it has
no bearing upon the question now presented.

In *Jennings v. Whitehead & Atherton Machine Co.* the plain-
tiff had made a written contract with the firm of Whitehead &
Atherton to give his undivided influence in favor of machinery
made by the defendant who promised to pay him five per cent.
on sales of machinery in Fall River. The plaintiff declared
upon the contract and also upon an account annexed but relied
upon an oral contract adopting the written agreement. The
only change between the oral and the written contract was that
the defendant corporation was substituted for the firm. The
evidence of the adoption of the written contract was a conversa-

tion between the plaintiff and Whitehead, who became president
of the corporation, and the subsequent acts of the corporation
in dealing with the plaintiff as to sales.   The court held that as
the contract relied on was oral "the rule that evidence of pre-
vious or contemporaneous conversations between the parties can
not be received to vary or control a written contract is not
directly pertinent," and that evidence was admissible of Ather-
ton, the treasurer of the corporation, of conversation with the
plaintiff some days before the written contract was signed in
which the plaintiff said that he would do certain things if they
would let him sell their machinery, in consequence of which the
contract was written and signed, the evidence being offered to
explain what was intended by "undivided influence" in the writ-
ten contract.   The court held that the evidence was competent
under the circumstances since it did not appear what the con-
versation was which the plaintiff contended was an adoption by
the corporation of the written contract.   "Whatever reference
was made in that conversation to the written contract it could
not incorporate that contract as a written contract into the oral
agreement of the parties.   The agreement entered into in that
conversation was wholly oral and if the written contract was
vague or obscure in its meaning we think it was competent to
show from statements made by the parties to each other what
both parties understood it to mean and also to show what it had
actually been interpreted to mean by the original parties in
their dealings under it for the purpose of proving what the same
persons meant in making an oral contract similar or the same in
terms, even if the evidence would have been incompetent had the
new contract been in writing." The case merely illustrates the
rule of allowing evidence of prior statements of parties and
their practical construction of an agreement to explain doubtful
terms.

    The company further offered to explain the contract by evi-
dence, which was refused, that "notwithstanding the recital in

the first page or two of the contract, that the real relations and standing of these parties was and the reasons for the arbitrary price was because of the fact that certain duties had been performed by the Kipahulu Sugar Company which made that price the basis of the settlement between these parties and it was only the question of tonnage and not the question of ownership of any proportion of the sugar;" that when the contract went into effect the company had expended $96,806.75 for the crop of 1907 and $56,904.83 for the crop of 1908; that when the sheriff made his levy Ah Ping owed $74,425.74 on the contract; that he paid no consideration for the crops when the contract was made, the only consideration being that "he should perform certain services—expend certain amounts in the cultivation of said growing crops and to manufacture the said growing crops into sugar and deliver the sugar to the Kipahulu Sugar Company, and for his entire compensation he should receive the sum of twenty dollars or thirty dollars for the crop of 1908 less all advances made by the Kipahulu Sugar Company to him for the cultivation of said crop;" what the market price of the sugar was when levied upon; that the company and Ah Ping understood and agreed that no proprietary interest of any kind should attach to the sugar made under the agreement; that Ah Ping's only compensation under the agreement was the percentage for each ton of sugar less the company's advances; that during the entire existence of the contract the understanding and result of it has been that Ah Ping never claimed any interest in the sugar but accepted a credit "for each ton of sugar in accordance with the terms and amounts set forth in the agreement;" that advances by the company for cultivating the crop from which the sugar was made exceeded the percentage.

The company requested admission of certain facts, stated in substance as follows: That Ah Ping if present would testify that he is a resident of Kipahulu engaged in cultivating and manufacturing sugar on the lands of the company under an

agreement between himself and the company of March 11, 1907, and was so engaged during all the time set forth in the request; that in accordance with the agreement he supervised the cultivation of sugar cane on the lands of the company and the manufacture of the cane into marketable sugar, contributed nothing towards the cultivation of the cane and manufacture except his personal services, and from advances made to him; that the funds for cultivation and manufacture and payment of rents, taxes and other financial obligations set forth in the agreement to be made and performed by him have been furnished to him by the company through H. Hackfeld & Co., its agent; that the total advances for cultivating the crop of 1908 up to December 10, 1906, were $96,806.75, and for the crop of 1910 up to December 10, 1906, $56,904.83; that the amount advanced by the company in the cultivation of the crops was $74,435.74 over and above all percentage due to him by reason of the cultivation of the crops and manufacture of sugar; that under the terms of the agreement he had no proprietary interest in any of the sugar and was only entitled to payment from the company as compensation for his services at a certain rate per ton for sugar delivered by him f. o. b. steamer at Kipahulu and was not entitled to any payment on account of the tonnage unless at the termination of the agreement there shall be a credit balance due him over and above advances by the company; that the sugar levied upon was part of the crop of 1908; that the crop of 1907 was 1780 tons, his percentage over and above the cost of production being $3124.14; that the crop of 1908 was 1843 tons and owing to greater cost of production the percentage due him as his compensation has been about offset by the funds furnished by the company; that during all the time covered by the agreement he has received $100 a month from the company for his own personal use and that in the event of failure of the enterprise of planting, cultivating and manufacture of sugar this is the only compensation that he is to receive under the agreement.

The judgment creditors admitted that Ah Ping, if present and if permitted to do so, would testify to these facts and agreed that the statements might be offered as his testimony subject to objections to relevancy and competency. When the statement was offered objection was made to the proposed evidence that Ah Ping contributed nothing to the enterprise except his personal services and to the proposed evidence of the advances made to him as irrelevant and immaterial; to evidence that he had no proprietary interest in the sugar as a conclusion of law; to evidence that he was not entitled to payment unless at the end of the agreement there should be a balance due him as irrelevant, immaterial and a conclusion of law, and to all the other proposed evidence as irrelevant and immaterial.

It is fully agreed by the parties that words in an agreement which have an ordinary meaning free from ambiguity and are not technical cannot be explained by extrinsic evidence, the only dispute between them on the subject of excluded evidence being as to the existence of such words. Whatever uncertainty there may be in the minds of the parties as to the legal effect of the language in this agreement we see in it no words of ambiguous or doubtful meaning. The proposed evidence of the witness' opinion, understanding or conclusions was of course inadmissible. The evidence was therefore correctly ruled out. It remains to consider the legal effect of the agreement as a whole.

The agreement, after reciting the ownership by the company of the plantation property, that negotiations have been pending between it and the planter, as Ah Ping is termed, by which he is to be given an opportunity to engage in the enterprise of raising sugar cane and manufacturing the same into sugar, and that an agreement has been reached as to the terms under which he should engage therein on the lands of the company, declares as follows:

"I.  The 'Planter' shall have the free use of all the lands owned in fee simple by the 'Company' except as herein specifi-

cally excepted; the 'Planter' shall have the use of all lands now under lease by the 'Company' subject to the payment of all rents and other charges which may become due upon such leasehold property during the continuance of this agreement and subject to the terms and conditions of the leases under which said lands may be held, all growing crops now upon said lands to become the property of the 'Planter;' the 'Planter' shall have the free use of all buildings, machinery, flumes, tanks, tools, carts, wagons, harnesses and other appurtenances now belonging to the 'Company' free of all charge saving and excepting that said 'Planter' shall keep all said property in good repair and at his own expense and shall also construct at his own expense all improvements which he may deem necessary, and at the termination of this agreement he will deliver the same according to inventory attached hereto and made a part of this agreement together with all new improvements and additions thereto, in good condition, ordinary wear and tear alone excepted; the 'Planter' shall also have the right to use the live-stock now belonging to the 'Company', he to pay all cost and maintenance and to take proper care of all such animals and to replace all live-stock which may die by reason of any neglect on his part.

"II. All merchandise in store will be delivered to the 'Planter' by the 'Company' at cost price, further purchases to replenish stock are to be made from or through the 'Agent', for which the 'Planter' is to pay sixty days from the last of each month in which such purchases shall have been made.

"III. The 'Company' will pay the 'Planter' for each and every ton of sugar 2000 pounds delivered F. O. B. vessel or steamer at the wharf of the 'Company' in Kipahulu as follows, to wit: $20 per ton of crop, Season of 1907. $30 per ton of crop, Season of 1908. $50 per ton of crop, Season of 1909, delivered by the 'Planter' free of charge to the 'Company' in Honolulu.

"IV. The 'Planter' shall be allowed for his own personal use the sum of One Hundred ($100.00) Dollars per month, this amount to be a part of the advance account to be made under this agreement and to be repaid by the 'Planter' in like manner as other advances."

Then follow nine articles to the effect that the planter agrees to furnish sufficient labor to cultivate successfully and manufacture not less that 1400 tons of sugar for the crop of 1908 and 1500 tons for the crop of 1909, with provisions for making as large a proportion of Grade "A" sugar of 96° polarization and as much over as possible allowing and deducting according to San Francisco and New York prices for any degree above or below; for keeping the property in repair and making necessary improvements and delivering the same with all improvements in like good order and condition as he received them, ordinary wear and tear alone excepted; for proper cultivation of the crops, payment of taxes, rents and charges; for buying of merchandise and supplies from or through the agent; employing a suitable engineer and sugar boiler to the agent's satisfaction; furnishing the agent with weekly reports of the sugar boiler of all sugars manufactured and a monthly report of expense; keeping books of account showing the cost of each crop.

The agreement goes on to state that "it is mutually agreed as follows:" then come fourteen articles referring to payment by the company to December 10 of employes who refuse to go on with the planter and for the planter paying the laborers for wages due after that date; for delivery to the company, to be charged to his account, of all cash then on hand; that the agent should be agent of the planter and that all advances be drawn on or through the agent; interest to be charged to the planter at six per cent. per annum on overdrafts and allowed on credits; the planter to be considered the contractor only and to have no power to represent the company or act as its agent; tax returns and other documents to be drawn by the company only; accounts to be kept by the agent between the company and the planter, entitled "Ah Ping, Advance Account with the Plantation Department," and his "Merchandise Account with the Merchandise Department," the first to con-

tain all payments, advances, deposits and credits relating to the conduct of the plantation, the other to charge for merchandise and supplies purchased by Ah Ping for the plantation store; that for sugar delivered to the steamer or vessel, as above set forth, credit will be given to the plantation account; sugar sold by the planter in Kipahulu to be charged to him at its sale value, he being credited with the amount per ton for crops as herein set forth and a settlement to be had at the termination of the agreement; the agent to appoint an inspector of the fields and crops and to give such directions to the planter as he deems necessary for the performance of his agreement; that the small cottage in the yard below the manager's house be kept furnished by the planter for visitors, furniture and bedding supplied by the company, the planter to be compensated for entertaining visitors on the company's business; the cottage in the small mule yard to be retained for the bookkeeper; the agent to make advances in accordance with the recommendation of the inspector based on the following rates—during 1907 for the 1908 crop $15 for each estimated ton; during 1907 for 1909 crop $20 for each estimated ton; for 1908 the balance on each manufactured ton of the crop of 1908; during 1908 for the 1909 crop $15 for each estimated ton; during 1909 the balance due for each manufactured ton of the crop of 1909, the company to make good any deficit at the termination of the agreement by reason of the planter's failure to make full payment of advances; all money from sale of sugar to remain on deposit with the agent until final settlement, the planter being allowed interest at six per cent. per annum on credit balances of at least six months' standing; sugar at date of the contract in tanks or coolers to remain the property of the company but the planter to perform the necessary labor to properly manufacture it into marketable sugar, the company paying for the labor; the agreement to be in force from December 15, 1906, until the crop of 1909 shall have been fully manufac-

tured, with privilege of extension on terms to be agreed upon unless sooner terminated by mutual agreement or upon the entry of the company upon the premises, which may be done if the planter fail to observe any of his agreements or to produce properly manufactured marketable sugar as contemplated by the agreement, or if he abandon the cultivation for three months after notice from the company to conform to the agreement; if the company take possession as above conditioned an accounting between it and the planter to be had wherein the planter shall be entitled to all crops and sugar then on hand at its actual value less deductions for damages to the company for the planter's failure to carry out his agreement or for any loss or deterioration of the property surrendered; upon failure of the parties to agree upon payments to be made or duties to be performed the question in dispute to be submitted for adjustment to a board of three arbiters, one to be appointed by the company, one by the planter and one by the agent, the decision of the majority to be final and binding on all parties.

It is apparent from this agreement that in order to secure the requisite laborers to be engaged and superintended by Ah Ping, except that the company and its agent control the selection of the sugar boiler, engineer and bookkeeper, the company gave Ah Ping for the purpose of cultivating cane and making sugar the use of its plantation outfit charging nothing except rents payable on the leasehold, and giving him the standing crops, the purpose of the agreement being to secure crops of not less than 1400 tons for 1907 and 1500 tons for 1908. The difference between sugar at 1 ct. a pound taken off in 1907, 1½ ct. a pound in 1908 and 2½ cts. a pound from the crop in the season of 1908, and the usual market prices which the company obtained for its sale would be expected to recoup the company and its agent for advances, give them reasonable profit and possibly allowing a reasonable profit to Ah Ping for his services.

The agreement contains no provision for securing its per-

Henry v. Shields, 19 Haw. 302.

formance by Ah Ping by a mortgage or lien upon the crops or sugar. There is no ground for taking it to mean anything else than what it says, namely, that the standing crops should become his property and he should go on to raise sugar cane and manufacture sugar. A careful estimate must have been made by the parties of the margin between the ordinary expenses of running a 1500 ton plantation, taking the average cost of production and the profit in buying its sugar at $20, $30 and $50 a ton for the seasons of 1907, 1908 and 1909. The instrument would have to be reformed in order to give the company title in the sugar. There is nothing expressed in the agreement which explains away or is irreconcilable with the provision that the standing crops should become the property of Ah Ping, and that after carrying on the plantation by means of advances to be made to him through the agent the company would pay the prices named for the sugar which he was expected to deliver to it.

Exceptions overruled.

*C. H. Olson* (*Holmes & Stanley* on the brief) for Walter C. Shields and Theo. H. Davies & Co.

*H. E. Cooper* for Kipahulu Sugar Co.